**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tresa Floyd,<br><br>                Plaintiff,<br><br>v.<br><br>Maricopa County,<br><br>                Defendant. | No. CV-14-02617-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendant's Motion for Summary Judgment (Doc. 59).

## I.   LEGAL STANDARD

Summary judgment is proper if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must produce evidence and show there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may carry its initial burden of production under Rule 56(c) by producing "evidence negating an essential element of the nonmoving party's case," or by showing, after suitable discovery, that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).

The party seeking summary judgment bears the initial burden of identifying the basis for its motion and those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its burden, the nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is one that might affect the outcome of the suit under the governing law. *Id.* at 248. A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

On summary judgment, the nonmoving party's evidence is presumed true, and all inferences from the evidence are drawn in the light most favorable to the nonmoving party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001). But it is not the Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The evidence presented by the parties must be admissible. LRCiv 56.1(a), (b); *see* Fed. R. Civ. P. 56(e). Conclusory and speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. 56(e)(2).

## II.   UNDISPUTED MATERIAL FACTS[1]

Plaintiff Tresa Floyd is a current employee of Defendant Maricopa County in the Department of Public Health where she has worked for approximately ten years. In February 2010 Plaintiff was diagnosed with multiple sclerosis and told her supervisor Corinne Velasquez. Plaintiff has reported to Velasquez throughout her career with Defendant.

In October 2013, during the time Plaintiff was employed as Operations Supervisor of the Healthcare for the Homeless Clinic, she experienced a flare-up of her multiple sclerosis, with symptoms of "numbness, impairment of muscular coordination, falling down while attempting to walk or stand, weakness, spasticity, leg tremors, great difficulty with fine motor tasks with her hands such as grasping and typing, and severe fatigue." (Doc. 62-1.) Plaintiff informed Velasquez she needed assistance to deal with the new symptoms of her disability and requested to work from home. Velasquez permitted her to work from home, and Defendant provided the assistive software Plaintiff requested.

After two weeks, on October 24, 2014, Plaintiff told Velasquez her condition was not improving and requested permission to continue telecommuting. Velasquez denied the request, saying the Healthcare for the Homeless Clinic supervisor needed to be on-site. Velasquez suggested that Plaintiff voluntarily step down from her supervisory position to assume a less demanding position. Plaintiff requested leave under the Family Medical Leave Act ("FMLA"), which Defendant granted. Plaintiff was on FMLA leave from approximately October 31, 2013, through January 13, 2014.

---

[1] Each party has objected to some of the other party's purported statements of fact for various reasons, primarily for mischaracterizing the evidence cited, relevance, and/or inadmissible hearsay. Defendant also objects because Plaintiff's controverting statement of facts includes arguments rather than only references to the specific admissible portion of the record supporting her position as required by LRCiv 56.1(b). The Court has not relied on the parties' characterization of evidence regarding material facts, but has considered the evidence cited and submitted by the parties with respect to all facts that actually are material. Assertions regarding facts that are immaterial have not been considered. Therefore, all evidentiary objections are denied as moot.

On October 31, 2013, Velasquez responded to an email from her supervisor, Dr. Bob England, Director of Public Health, regarding a budget concern. Velasquez commented:

> We know Tresa [Plaintiff] is out for 2 weeks, maybe longer. Jane, the Accountant, is going to have surgery and will be out for 4–6 weeks starting mid-December. . . . And Christy, the billing person, is due to have a baby in mid-February. And the close out of the grant has to occur and be reported by the end of January, and the UDS report will be due by the end of March. And guess whose job it is to close the grant and do the report? Tresa's and Jane's. And guess who was supposed to attend UDS training and complete the UDS? Tresa, Jane and Christy. And the last Notice of Grant Award for the year starting tomorrow gave us 45 days to fix all the budget documents that were submitted with the application—but now we're down to 30 days because I don't think anyone even looked at it (good thing I happened to have looked at it yesterday).
>
> Sorry—I'm just venting.

(Doc. 62-1 at 83.)

During Plaintiff's FMLA leave, Velasquez initially assumed day-to-day responsibility for the Healthcare for the Homeless Clinic. On November 13, 2013, Plaintiff told Velasquez she was still having difficulty with the symptoms of her multiple sclerosis and would need to extend her FMLA leave until early January 2014. At that point, Velasquez decided to put someone on a special work assignment to cover for Plaintiff at the Clinic on a full-time basis. She told England it was questionable whether Plaintiff would be back in January.

Velasquez assigned Erica Bouton to a special work assignment to cover for Plaintiff. During Plaintiff's FMLA leave, Velasquez and Bouton observed some aspects of the day-to-day operations that Velasquez thought were improper or inefficient and needed to be changed. Examples of concerns were that the Clinic floors were dirty, the Clinic flow was inefficient, and delegation of duties was insufficient.

On December 31, 2013, Plaintiff told Velasquez she would be returning to work on January 13, 2014, and would need to work only three days per week because she

- 4 -

would be continuing physical therapy on Tuesdays and Thursdays. Velasquez approved the request and notified Human Resources. On January 3, 2014, Nurse Supervisor Jennifer Zirzow submitted a complaint to Human Resources regarding Plaintiff. Before Plaintiff returned from leave, Erika Leger also submitted a complaint to Human Resources regarding unprofessional comments made by Plaintiff.

On January 7, 2014, Velasquez emailed to Janice Stratton, Human Resources Manager, a document titled "Notes to discuss with Tresa." The Notes include concerns about building issues, such as dirty floors, storage areas filled with never used items, and dysfunctional training equipment. The Notes also include concerns about staff training, delegation of responsibility, budget, physician recruitment, staff attendance and schedules, policies and procedures, staff communication, staff equity, and Clinic flow/process changes.

On January 10, 2014, Velasquez told her management team that Plaintiff would be returning to work on January 13, 2014. She also told them and Plaintiff that Bouton would continue for a week to help Plaintiff regarding changes that had been made. Zirzow expressed concern to Velasquez regarding Plaintiff's anticipated reaction to the changes.

Also on January 10, 2014, Velasquez told Plaintiff that an employee complaint had been made, Velasquez had other concerns about the Clinic, and there would be a meeting with Human Resources about a week after Plaintiff returned to work. Velasquez told Plaintiff that when she returned, she was not to have any interaction in the Clinic and not to make any changes to the Clinic procedures that Velasquez and Bouton had recently implemented.

On January 13, 2014, Plaintiff returned to work, and Velasquez told her that Bouton would be staying on-site at the Clinic for two weeks. During the first two weeks of Plaintiff's return to work, Plaintiff worked three days per week.

On January 15, 2014, Plaintiff's second day back to work, she advised Stratton that she had concerns regarding her job role and wanted clarification of her rights upon returning to work after FMLA leave. Stratton asked Plaintiff to put her concerns in writing, but Plaintiff did not do so because she felt that everyone was conspiring against her and Human Resources would not support her.

On January 21, 2014, Plaintiff met with Velasquez and Stratton. Stratton told Plaintiff that an employee filed a complaint about Plaintiff during Plaintiff's absence, which would be investigated by Human Resources and there could be consequences if the complaint was substantiated. Plaintiff questioned Velasquez regarding Bouton remaining at the Clinic. On January 28 through February 5, 2014, nine employees were interviewed, during which additional allegations regarding Plaintiff were made. On January 29, 2014, Velasquez again suggested Plaintiff voluntarily step down from her supervisory position.

On February 20, 2014, Stratton and Laiza Madrid, Human Resources Analyst, interviewed Plaintiff about all of the allegations that had been identified. Stratton identified four primary areas of concern: (1) kicking Zirzow during two meetings; (2) allowing employees to work "off the clock" or improperly flex time; (3) using profanity speaking with staff and referring to clients of the Healthcare for the Homeless Clinic; and (4) allowing Plaintiff's sister to use Healthcare for the Homeless Clinic services improperly. During the interview, Plaintiff admitted that she had kicked Zirzow under the table during a meeting to get her attention to tell her to stop talking. Plaintiff also admitted that it was not uncommon for her to use profanity and that she allowed her staff to use profanity even though it was a violation of Maricopa County policy to do so. Plaintiff denied that homeless services, such as transportation, were provided to her sister that were not provided to other clients. Other witnesses said that the medical van driver was used only to transport clients to medical appointments, not other case management appointments.

Max Porter is the Deputy Director of Public Health and Appointing Authority for the Maricopa County Department of Public Health. As the Appointing Authority, Porter makes final decisions for the Department on personnel actions, such as suspension, demotion, and dismissal.

Stratton briefed Porter about the investigation of Plaintiff by Human Resources during the course of the investigation and prior to completion of the investigation report. Porter concluded that Plaintiff should not continue in a supervisory role. He directed Stratton to prepare a disciplinary notice with intent to demote Plaintiff from her position as Operations Supervisor at Healthcare for the Homeless. There is no evidence in the record that Porter was aware of Plaintiff's disability when he directed Stratton to prepare the disciplinary notice.

On March 26, 2014, Plaintiff was notified by a hand-delivered letter from Porter that he intended to demote Plaintiff because she used County resources for her personal use, willingly ignored her supervisor's direction, used and allowed staff to use profanity, willingly violated County and Public Health policies and procedures, and demonstrated behavior inappropriate for a supervisor. The letter informed Plaintiff she had the right to meet with Porter on March 31, 2014, and present orally or in writing, or both, her explanation of why the proposed disciplinary action was not appropriate. On March 31, 2014, Plaintiff presented a written response, denying that certain actions had occurred and stating that she did not believe her actions had violated County policy.[2] Porter requested that Stratton follow up with certain employees about the statements made by Plaintiff.

On April 10, 2014, Plaintiff was notified by a hand-delivered letter from Porter that she was demoted from her position as Operations Supervisor of the Healthcare for the Homeless Clinic to the position of Client Services Coordinator for the Refugee Clinic

---

[2] It appears that Plaintiff met with Porter in person on March 31, 2014, in addition to submitting a written response to Porter's letter.

- 7 -

effective April 14, 2014. The letter stated that the reasons for her demotion were she used County resources for her personal use, willingly ignored her supervisor's direction, used and allowed staff to use profanity, willingly violated County and Public Health policies and procedures, and demonstrated behavior inappropriate for a supervisor. The letter notified Plaintiff of her right to appeal the demotion to the Merit System Commission within ten business days of the hand delivery of the notice. Plaintiff did not appeal the demotion.

On April 14, 2014, Plaintiff did not report to work, indicating she needed to see her doctor and would not be able to work. Subsequently she requested additional FMLA leave and an extended absence under the Americans with Disabilities Act ("ADA"). Both requests were granted. Subsequently, Plaintiff requested and was granted a part-time work schedule and some restrictions during the summer.

On May 29, 2014, Velasquez met with Plaintiff to discuss Plaintiff's annual performance evaluation. During the meeting, Plaintiff accused Velasquez of engaging in a "witch hunt." Plaintiff said that Velasquez, England, Porter, and Stratton had "manipulated this whole thing to get rid of her when she returned from leave." Velasquez reminded Plaintiff that she had tried to talk to her about finding something else for her, Plaintiff had refused a less demanding position, and Plaintiff had said if Velasquez wanted her gone, she would have to make it happen.[3]

Subsequently Plaintiff requested a higher review of her performance evaluation. Porter provided the higher review as requested by Plaintiff and responded to each of the four concerns she had raised. He explained that objections to her demotion should have

---

[3] Plaintiff misinterprets Velasquez's restatement of Plaintiff's assertion that if Velasquez wanted her gone, Velasquez would need to do something, as Defendant's admission of improper motive. It merely shows that Plaintiff announced she would not voluntarily resign. Velasquez did not say she wanted Plaintiff "gone."

- 8 -

been brought in an appeal to the Merit System Commission and were not properly raised in the review of her performance evaluation for her current position.

## III. ANALYSIS

### A. Count I: Interference with Family Medical Leave Act ("FMLA") Rights

Under the FLMA, an employee may take up to twelve weeks of leave for personal medical reasons, and, upon return from leave, the employee has the right to be restored to her original position or a position with equivalent benefits, pay, and conditions of employment. *Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003) (citing 29 U.S.C. § 2614(a)). The FMLA guarantees that an employee's taking leave will not result in any adverse employment actions, but it does not entitle the employee to any right, benefit, or position she would not have been entitled to had she not taken FMLA leave. *Id.*

The FMLA prohibits employers from interfering with an employee's exercise of her rights under the FMLA. *Id.* (citing 29 U.S.C. § 2615(a)(1)). An employee can prove an employer interfered with her FMLA rights by showing by a preponderance of the evidence that the employer considered her taking of FMLA leave as a factor in the decision to terminate her. *Id.* at 1135–36. When an employee is subjected to negative consequences simply because she has used FMLA leave, the employer has interfered with the employee's FMLA rights. *Id.*; 29 C.F.R. § 825.220 ("[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.").

Plaintiff does not dispute that when she returned from FMLA leave, she returned to the position she had before the leave and she remained in that position for three months. Plaintiff states that her FMLA claim does not depend on whether she was properly reinstated, but rather on evidence that her use of FMLA leave constituted a negative factor in the decision to demote her. (Doc. 61 at 10.)

Plaintiff contends that the following evidence shows that Defendant considered Plaintiff's use of FMLA leave as a factor in its demotion decision: (1) Velasquez

suggested to Plaintiff multiple times that she voluntarily leave her supervisor position; (2) Velasquez complained to England that certain projects were coming due when the three employees responsible for those projects would all be on medical leave; (3) Velasquez discounted Zirzow's complaints about Plaintiff when she thought Plaintiff would not be able to return to work, but investigated them after she returned; and (4) Defendant's efforts to demote Plaintiff began immediately upon her return from FMLA leave. The specifics from which Plaintiff would infer wrongful consideration of her FMLA leave would be present if there were no such consideration. Plaintiff's proffered evidence may fail the test for relevance because it does not tend to make it more probable that Defendant considered Plaintiff's use of FMLA leave as a factor in its demotion decision. *See* Fed. R. Evid. 401.

### 1. Suggesting Voluntary Demotion

In October 2013 Plaintiff experienced exacerbation of her multiple sclerosis with severe symptoms, and Velasquez permitted her to work from home temporarily. After two weeks, Plaintiff told Velasquez her condition was not improving and requested permission to continue telecommuting. Velasquez denied the request because the Healthcare for the Homeless Clinic needed an on-site supervisor. In the context of Plaintiff saying she was unable to perform on-site supervisory duties, Velasquez suggested that Plaintiff step down from the supervisory position, and Plaintiff requested FMLA leave.

Before October 2013, Plaintiff was capable of performing her supervisory duties on-site. Therefore, it is not "notable" that before October 2013 no one had suggested that Plaintiff step down from her supervisory position. After Plaintiff reported that her condition was not improving after two weeks, despite working from home and treatment, it was reasonable for Velasquez to question whether Plaintiff would be able to return to performing the essential tasks of the supervisory position, including being present on-site.

Suggesting Plaintiff consider a less demanding position does not provide a basis for inferring her FMLA leave was considered in the demotion decision.

Plaintiff rejected the suggestion to step down from her supervisory position and chose to take FMLA leave without pay instead. There is no evidence showing that in making the demotion decision Porter considered Plaintiff's rejection of Velasquez's suggestion as a negative factor.

### 2. Velasquez Complaining to England

There is no evidence that Porter's demotion decision considered the inconvenience caused by Plaintiff's FMLA leave. Velasquez's email that Plaintiff relies on complains about trying to meet certain demands while all three of the employees responsible for those demands would be on leave. It concludes with the comment, "Sorry—I'm just venting." Plaintiff does not contend the other two employees were demoted.

There is no evidence showing that in making the demotion decision Porter considered that Plaintiff's FMLA leave was inconvenient for Velaquez. Moreover, the inconvenience does not provide a basis from which it can reasonably be inferred that Plaintiff's FMLA leave was considered in the demotion decision.

### 3. Investigating Zirzow's Complaints

Plaintiff contends Velasquez knew that Zirzow's complaints about Plaintiff were in retaliation for Plaintiff's role in Zirzow's probationary period being extended and Zirzow not receiving a pay increase, and as a result Velasquez initially discounted Zirzow's complaints about Plaintiff. Plaintiff reasons that Velasquez's decision to investigate the Zirzow's concerns after Plaintiff returned from FMLA leave, but not before, shows that the leave was considered in her demotion. However, the evidence shows that the investigation was conducted by Human Resources as a result of Zirzow submitting a complaint to Human Resources, not because of Zirzow's complaints to Velasquez on January 3, 2014.

- 11 -

Plaintiff relies on a December 13, 2013 email exchange between Velasquez and Bouton in which Bouton stated that Zirzow was "really upset that her inability to get an increase in salary was based on things that Tresa said that 'simply are not true,'" and that Zirzow said she was going to file a complaint with Human Resources. Velasquez responded to Bouton that she would like to meet with Bouton and Zirzow together so that they all would hear the same thing and Bouton would know what Velasquez said to Bouton. Velasquez also said that Zirzow "doesn't listen well," and she had already told Zirzow that Velasquez does not control the things that Zirzow complained about, *i.e.*, working for Plaintiff and her salary.

The December 13, 2013 email exchange suggests that Velasquez attempted to resolve Zirzow's concerns without involving Human Resources. There is no evidence supporting Plaintiffs' contention that Velasquez initiated the investigation because she learned that Plaintiff was going to return from FMLA leave. There is no evidence that Velasquez had any control over the investigation once Zirzow submitted a complaint to Human Resources. Moreover, it is not surprising that on January 7, 2014, Velasquez forwarded to Human Resources her notes regarding concerns she had identified during the previous months when she had covered Plaintiff's responsibilities because they were relevant to Zirzow's complaint submitted to Human Resources on January 3, 2014.

The investigation of Zirzow's complaint does not provide a basis from which it can reasonably be inferred that in making the demotion decision Porter considered Plaintiff's FMLA leave.

### 4. Temporal Proximity

Plaintiff contends that the timing of Defendant's efforts to demote Plaintiff, immediately after her return from FMLA leave, is suspicious. However, Velasquez began identifying concerns about Plaintiff's performance during Plaintiff's absence when Velasquez covered Plaintiff's duties on a part-time basis, and more concerns were identified by Bouton when she filled in on a special assignment. The Human Resources

investigation was initiated by Zirzow's complaint filed on January 3, 2014, before Plaintiff returned from FMLA leave.

Although the investigation of Zirzow's complaint unearthed evidence of Plaintiff's inappropriate conduct throughout 2013, there is no evidence showing that Zirzow filed her complaint or Human Resources began its investigation *because* Plaintiff took FMLA leave. There is no basis for speculating that, but for her FMLA leave, Defendant would have overlooked Plaintiff's violations of County and Public Health policies and procedures, disregard for direction from supervisors, and misuse of public resources. Rather, these deficiencies were exposed because Velaquez and Bouton fulfilled Plaintiff's responsibilities in her absence.

Plaintiff has not shown that there are genuine issues of material fact such that a reasonable jury could return a verdict in her favor on Count I.

**B.     Count II: Disability Discrimination in Violation of the Americans with Disabilities Act ("ADA")**

Plaintiff alleged that Defendant demoted her from a supervisory position because of her disability. To state a prima facie case under the ADA, Plaintiff must show that (1) she is a disabled person within the meaning of the ADA; (2) she can perform the essential functions of her job, with or without reasonable accommodation; and (3) Defendant demoted her because of her disability. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999). Defendant does not dispute that Plaintiff is a disabled person within the meaning of the ADA and she can perform the essential functions of her job.

Plaintiff bears the burden of proving, by a preponderance of the evidence, that her disability actually played a role in Defendant's demotion decision. *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004). She may meet this burden by producing direct evidence from which a reasonable jury could conclude her disability actually motivated the demotion decision and/or by evidence discrediting Defendant's

proffered non-discriminatory explanation. *Id.*; *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093–94 (9th Cir. 2001).

Plaintiff's proffered evidence of discriminatory motive is essentially the same as that discussed above: attempts to persuade Plaintiff to voluntarily step down from her supervisory position, inconvenience caused by Plaintiff's FMLA leave, investigation of a disgruntled employee's complaint, Velasquez's list of concerns sent to Human Resources, and suspicious timing. This evidence does not show a discriminatory motive any more than it shows that FMLA leave was considered in the demotion decision.

In addition, Plaintiff contends that the Human Resources investigation was mere pretext. Plaintiff argues that the investigation was not officially completed until March 26, 2014, because that is the date on the final investigation report, and Porter's letter notifying her of his intent to demote and her opportunity to respond had the same date, so his intent to demote must have been formed before the investigation was completed. Plaintiff points to drafts of the letter created and reviewed before March 26, 2014, as evidence that Stratton, Porter, and Velasquez had predetermined the outcome of the Human Resources investigation. However, creating a final version of the investigation report on March 26, 2014, does not mean the investigation was incomplete until March 26, 2014. A draft letter dated March 18, 2014, a month after interviews were completed, proves nothing.

Plaintiff also has not produced evidence discrediting Defendant's non-discriminatory explanation for its demotion decision. Porter stated Defendant's reasons for demoting Plaintiff in his April 10, 2014 disciplinary action letter: Plaintiff used County resources for her personal use, willingly ignored her supervisor's direction, used and allowed staff to use profanity, willingly violated County and Public Health policies and procedures, and demonstrated behavior that is inappropriate for a supervisor. Those reasons are legitimate, non-discriminatory, and supported by evidence in the record.

### 1. Personal Use of County Resources

On two occasions Plaintiff directed the Healthcare for the Homeless van driver to transport Plaintiff's sister. The driver's responsibility to transport clients is limited to picking them up and transporting them to medical appointments. The client is responsible for finding transportation back to transitional housing. On the first occasion, Plaintiff directed the driver to pick up her sister at her hotel and transport her to the Healthcare for the Homeless Clinic to complete an application for health insurance. On the second occasion, Plaintiff directed the driver to pick up her sister at her apartment, transport her to meet with an employment agency located on the Clinic campus, and then transport her to work. Plaintiff's sister did not receive any medical services on either occasion, and on the second occasion she was not homeless. Moreover, Plaintiff's sister could have completed the health insurance application and obtained employment services at locations other than the Healthcare for the Homeless Clinic.

During the Human Resources investigation, Plaintiff said that it was normal for the van driver to pick up clients from their homes and bring them to the Clinic for services even though all of the others interviewed said the van driver was only authorized to transport them to medical appointments. The van driver reported that Plaintiff had directed him to pick up Plaintiff's sister and transport her as needed. Plaintiff denied that she had directed him to provide transportation for her sister.

### 2. Inadequate Supervision of Timesheet Compliance

Plaintiff did not ensure that her staff worked their assigned hours, reported time worked accurately, and did not work overtime for which they were not compensated. Plaintiff said she did not pay attention to whether her subordinates were working "off the clock." Plaintiff said she never noticed that her administrative assistant routinely "punched out" at 4:00 p.m. and then returned to her office to organize her work for the next day. However, in an April 2013 email, Plaintiff admitted that her administrative

assistant worked on and off the clock to meet the needs of the Healthcare for the Homeless Clinic.

### 3. Intentional Disregard of Direction from Supervisors

In late October 2013, Plaintiff met with the Interim Medical Director, Plaintiff's supervisor Velasquez, and Zirzow regarding moving patients through the Clinic efficiently. They decided that a new process or "flow" would be implemented. Plaintiff was directed to begin implementing the new process the following day. In early November 2013, when Plaintiff was on leave, Velasquez asked Zirzow why the changes had not been made. Zirzow said that after Velasquez and the Interim Medical Director left the October meeting, Plaintiff told her to forget what she had just heard, and the new process would not be implemented.

Plaintiff denied that she told Zirzow to ignore what they were told, but said she told Zirzow that when someone gives her a lot of information, she just takes what she can use. Plaintiff also said she told Zirzow that in her opinion the problem was not the process of moving patients through the Clinic, but rather confusing staff by being inconsistent, so she and Zirzow should just pick a process and stick with it. In other words, Plaintiff told Zirzow they should not implement the process directed by the Interim Medical Director and Velasquez. Plaintiff's interpretation of the meeting is that many items were discussed, but she received no specific instruction.

### 4. Use of Profanity

Plaintiff admitted to frequently using profanity, including references to staff and clients, and allowing her staff to use profanity even though it violated County policy, HR 2406, which prohibits the use of "foul language" in the workplace. Plaintiff said that she used profanity only with staff who used profanity with her and would not be offended. She also said that she had staff who come from different backgrounds, and if she tried to silence them or teach them social skills, they would not come in to talk to her. She said

that she knew that the use of profanity violated County policy, but "There are a lot of County policies that don't fit into what I have to go through every day."

Plaintiff contends that her cursing in private conversations with co-workers was well known to her superiors prior to her request for FMLA leave.

### 5. Inappropriate and Unprofessional Behavior

In February 2013, Plaintiff had a telephone conversation with one of the Clinic nurses who had just suffered a miscarriage and requested to be off work after twelve hours of labor. Plaintiff said, "What do you mean you aren't ready to come back yet? Are you kidding me, when I had my son I was in labor for twelve hours and he's still alive?" Plaintiff denied that she made any statement about her subordinate's miscarriage.

In June 2013, during a meeting with State of Arizona representatives, Plaintiff kicked Zirzow hard under the table. During a break, when Zirzow asked why Plaintiff kicked her, Plaintiff said that she wanted Zirzow to "shut the fuck up." Plaintiff initially said that she told Zirzow that she tapped her foot to get her attention, but not using that language. Later, Plaintiff said that after the meeting, they discussed the state audit, but not the kicking/tapping.

If Porter's demotion decision rested on nothing more than these two incidents, it could be inferred that he had an improper motive. However, Porter's findings regarding profanity, policy violations, and disregard for direction from her supervisors form a sufficient basis upon which Porter reasonably could have concluded that Plaintiff did not convey the professional demeanor appropriate for a supervisor and did not exercise appropriate judgment.

Porter's reasons for demoting Plaintiff were legitimate and nondiscriminatory. Plaintiff has not shown that Porter demoted Plaintiff because of her disability. Plaintiff has not produced evidence from which a reasonable jury could infer that Porter's reasons for his demotion decision were mere pretext. Plaintiff has not shown that there are

genuine issues of material fact such that a reasonable jury could return a verdict in her favor on Count II.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Doc. 59) is granted.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendant and against Plaintiff and that Plaintiff take nothing.  The Clerk shall terminate this case.

Dated this 25th day of February, 2016.

Neil V. Wake
United States District Judge